**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**ILANA SCHERTZMAN COHEN, *et al*.,**

  **Plaintiffs,**

  v.

**ISLAMIC REPUBLIC OF IRAN, *et al*.,**

  **Defendants.**

Civil Action No. 17-1214 (JEB)

---

<u>**MEMORANDUM OPINION**</u>

Almost eighteen years ago, a terrorist attack on a Jerusalem bus killed two teenage children and wounded scores more. Ten plaintiffs — injured victims of that attack and their families — now come before this Court seeking recompense for their physical and psychological injuries. Specifically, Plaintiffs seek to hold the Islamic Republic of Iran and the Islamic Revolutionary Guard Corps liable for damages under the terrorism exception to the Foreign Sovereign Immunities Act. As both Defendants failed to appear, default was entered last year. It now falls to the Court to determine whether to award default judgment and, if so, what damages are appropriate.

Finding the link between Defendants and the gunman plain, the first task is easy. Determining a fair amount of damages, conversely, requires a difficult weighing of relative injuries. The Court ultimately holds that individual sums of $400,000 to $2,500,000 are appropriate, yielding a total of $10,050,000.

**I.    Background**

On the afternoon of November 4, 2001, a Palestinian gunman opened fire on an Israeli bus traveling through the French Hill neighborhood of Jerusalem. <u>See</u> ECF No. 21 (Declaration

of Dr. Harel Chorev), ¶ 24.  Two passengers, 14-year-old Menashe Regev and 16-year-old Shoshana Ben Yishai, were killed; around 45 others were injured.  Id.  Shortly thereafter, the Palestinian Islamic Jihad (PIJ) claimed official responsibility for the attack.  Id., ¶ 25.

The ten Plaintiffs in this case are dual U.S.-Israeli citizens from the Schertzman and Miller families.  The seven Schertzman Plaintiffs consist of Ilana Schertzman Cohen — who was aboard the bus and injured in the attack — and six of her immediate family members who were not present.  The three Miller Plaintiffs are Myriam Miller and her two children, all of whom were passengers.  As detailed below, Ilana was hit by shrapnel and the three Millers were struck by glass and thrown around the bus.  One of the Miller children, Chana Aidel, later married Schertzman Plaintiff Yehuda Schertzman; the Court refers to two distinct families only for descriptive clarity.  In addition, for ease of distinction and with no disrespect intended, the Court often refers to Plaintiffs by their first names.

Plaintiffs filed suit against Iran and the IRGC on June 20, 2017.  See ECF No. 1 (Complaint), ¶ 1.  The Clerk of the Court certified that translated copies of the summons and Complaint were sent by DHL to both Defendants, see ECF No. 8 (Certificate of Mailing), but both refused delivery and returned the summons unexecuted.  See ECF Nos. 10 (Iran Summons Return) and 11 (IRGC Summons Return).  Undeterred, the Clerk transmitted the service documents to the U.S. State Department on February 5, 2018, see ECF No. 13 (Certificate of Mailing to State), which forwarded them to Iran's Ministry of Foreign Affairs through the Swiss Embassy in Tehran.  See ECF No. 15 (Service Affidavit).  Service was thereby effective under 28 U.S.C. § 1608(c)(1).  True to form, both Defendants failed to answer the Complaint.  As a result, Plaintiffs on June 12, 2018, requested an entry of default.  See ECF No. 16 (Affidavit for Default).  The Clerk did so on June 28.  See ECF No. 17.

Plaintiffs then moved for default judgment.  See ECF No. 18.  This Court held an evidentiary hearing on June 4, 2019, where it heard testimony from all Plaintiffs, as well as from experts Dr. Harel Chorev and Dr. Patrick L. Clawson.  See June 4, 2019, Minute Entry.  Having carefully weighed Plaintiffs' written statements and testimony, the Court now decides both liability and damages.

## II.     Legal Standard

Foreign states are generally immune from suit in federal court, subject to exceptions codified in the Foreign Sovereign Immunities Act.  See 28 U.S.C. § 1604; see also Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 439 (1989) ("[T]he FSIA [is] the sole basis for obtaining jurisdiction over a foreign state in federal court.").  Relevant here is § 1605A, the so-called "terrorism exception" to the FSIA.  See Fraenkel v. Islamic Republic of Iran, 892 F.3d 348, 352 (D.C. Cir. 2018).  This section provides federal courts with jurisdiction over suits where plaintiffs seek money damages from a foreign state for "personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act."  28 U.S.C. § 1605A(a)(1).  It also creates a cause of action for "national[s] of the United States" to sue foreign states that are designated by the U.S. government as sponsors of terrorism and perform or materially support the acts described in 28 U.S.C. § 1605A(a)(1).  Id., § 1605A(c).  The statute specifies that, "[i]n any such action, damages may include economic damages, solatium, pain and suffering, and punitive damages."  Id.; accord Fraenkel, 892 F.3d at 353.

To obtain a default judgment in such an action, plaintiffs must establish their claims "by evidence satisfactory to the court."  28 U.S.C. § 1608(e).  Plaintiffs who are successful may then recover damages by showing "that the projected consequences are reasonably certain (i.e., more

likely than not) to occur, and [proving] the amount of damages by a reasonable estimate."

Fraenkel, 892 F.3d at 353 (quoting Hill v. Republic of Iraq, 328 F.3d 680, 684 (D.C. Cir. 2003)).

While these requirements create "some protection against an unfounded default judgment,"

plaintiffs need not produce "more or different evidence than [a court] would ordinarily receive;

indeed, the quantum and quality of evidence that might satisfy a court can be less than that

normally required." Id. (citation omitted).

## III.    Analysis

The Court's analysis proceeds in three parts. It begins by clearing some jurisdictional

underbrush, then evaluates Defendants' liability, and finishes with a determination of appropriate

damage awards.

### A.    Jurisdiction

The FSIA both gives this Court subject-matter jurisdiction and waives Defendants'

sovereign immunity, subject to conditions Plaintiffs have met. Defendants also have been

properly served under 28 U.S.C. § 1608(a). The Court, accordingly, is satisfied that it has

jurisdiction over the suit.

#### 1.    *Subject-Matter Jurisdiction*

The state-sponsored-terrorism exception to the FSIA provides federal courts with subject-

matter jurisdiction over suits against a foreign state only where (1) "money damages are sought"

(2) "against a foreign state for" (3) "personal injury or death that" (4) "was caused" (5) "by an

act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material

support or resources for such an act." 28 U.S.C. § 1605A(a)(1); see also Oveissi v. Islamic

Republic of Iran, 879 F. Supp. 2d 44, 50–51 (D.D.C. 2012); Wultz v. Islamic Republic of Iran,

864 F. Supp. 2d 24, 32 (D.D.C. 2012).

All five conditions are met here. First, Plaintiffs seek only money damages. See Compl. at 18. Second, Iran and the IRGC qualify as foreign states. Courts in this district have held on multiple occasions that the IRGC is part of the Iranian government, and this Court agrees. See Ben-Rafael v. Islamic Republic of Iran, 718 F. Supp. 2d 25, 32 (D.D.C. 2010) ("All of the cases that have actually discussed the issue have found the IRGC to be part of the Iranian government, not an agency or instrumentality thereof."); Pl. Hrg. Exh. 14 (Declaration of Dr. Patrick L. Clawson), ¶¶ 23–25. Third, Plaintiffs allege personal injuries including physical harm and familial mental anguish. See Compl., ¶¶ 25–68.

As to the fourth element, Plaintiffs have met the causation showing required by the FSIA — namely, that Defendants' provision of material support caused their injuries. The Act requires only that Plaintiffs show "some reasonable connection between the act or omission of the defendant and the damages [that] the plaintiff has suffered." Valore v. Islamic Republic of Iran, 700 F. Supp. 2d 52, 66 (D.D.C. 2010) (citation omitted). This they have done. As discussed in detail below, Dr. Chorev testified that the PIJ carried out the attack that injured Plaintiffs, and Dr. Clawson testified that Iran and the IRGC provided substantial material support to the PIJ during the relevant period. See Chorev Decl., ¶ 38; Clawson Decl., ¶ 58. Courts in this district, moreover, have repeatedly noted Iran's support for the PIJ during and around this time. See, e.g., Wultz, 864 F. Supp. 2d at 30 (describing Iranian funding for PIJ from 1990s through mid-2000s); Belkin v. Islamic Republic of Iran, 667 F. Supp. 2d 8, 16 (D.D.C. 2009) (stating scholarly consensus is that PIJ was "heavily dependent" on Iranian support through turn of this century). The Court thus finds a reasonable connection between Defendants' actions and the damages Plaintiffs suffered.

Fifth and finally, the attack constituted an "extrajudicial killing" within the meaning of the Act. Not only were two teenagers killed on the bus, but this district's prior rulings hold that the FSIA terrorism exception encompasses underlined attempted extrajudicial killings, which clearly occurred here. See, e.g., Gill v. Islamic Republic of Iran, 249 F. Supp. 3d 88, 99 (D.D.C. 2017); Cohen v. Islamic Republic of Iran, 238 F. Supp. 3d 71, 81 (D.D.C. 2017). Finding all five criteria met, the Court concludes it has jurisdiction over Plaintiffs' claims.

2. *Waiver of Sovereign Immunity*

FSIA plaintiffs face an additional hurdle. Even where a court has subject-matter jurisdiction, FSIA defendants remain impervious to suit absent a waiver of sovereign immunity. Fortunately for Plaintiffs, the FSIA provides such a waiver when three conditions are met: (1) "the foreign state was designated as a state sponsor of terrorism at the time [of] the act . . . and . . . either remains so designated when the claim is filed under this section or was so designated within the 6-month period before the claim is filed under this section"; (2) "the claimant or the victim was, at the time [of] the act[,] . . . a national of the United States"; and (3) "in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim." 28 U.S.C. § 1605A(a)(2)(A)(i)-(iii); see also Wultz, 864 F. Supp. 2d at 33.

Plaintiffs meet all three conditions. First, Iran has been designated as a state sponsor of terrorism since 1984 and remains so designated today. See Dep't of State, Bureau of Counterterrorism and Countering Violent Extremism, State Sponsors of Terrorism, https://www.state.gov/state-sponsors-of-terrorism (July 10, 2019, 2:50 PM). Second, all ten Plaintiffs are United States nationals. See Compl., ¶ 17. Finally, the attack occurred in Israel,

not Iran; the third condition thus does not apply. Congress has therefore waived Iran's sovereign immunity, and derivatively the immunity of the IRGC, pursuant to 28 U.S.C. § 1605A.

### 3. *Service of Process*

One last threshold issue remains: service of process. 28 U.S.C. § 1608(a) sets out four methods by which service may be made, in ranked order. The summons and complaint may be delivered, first, "in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision," id., § 1608(a)(1), or, second, "in accordance with an applicable international convention on service of judicial documents." Id., § 1608(a)(2). If no such agreements exist, defendants must be served through a third method, which involves sending the requisite documents "by any form of mail requiring a signed receipt . . . to the head of the ministry of foreign affairs of the foreign state concerned." Id., § 1608(a)(3). And should that fail, plaintiffs may resort to method four: the Court Clerk may send the packet to the Secretary of State for transmittal "through diplomatic channels to the foreign state." Id., § 1608(a)(4); see also Republic of Sudan v. Harrison, 139 S. Ct. 1048, 1054 (2019).

Plaintiffs have successfully navigated this procedural thicket and effected service on both Iran and the IRGC. The parties lack a special service arrangement and are not signatories to a service convention, ruling out methods one and two. See Valore, 700 F. Supp. 2d at 70. Plaintiffs tried method three, mailing the forms for both Defendants to Iran's foreign minister in his home country, but Defendants rejected them. See Certificate of Mailing; Certificate of Mailing Attach. 1 (Waybill); Iran Summons Return; IRGC Summons Return; cf. Republic of Sudan, 139 S. Ct. at 1062 (requiring mailing to home country). Undeterred, Plaintiffs turned to method four. The State Department transmitted the documents to Iran's Ministry of Foreign Affairs through the Embassy of Switzerland on April 10, 2018. See Service Affidavit at 1. As a

result, service on both Defendants was finally effective as of that date.  See 28 U.S.C. § 1608(c)(1).  Because the IRGC is part of the Iranian government, this procedure effectuated service on it as well under 28 U.S.C. § 1608(a).  Id.; see also Ben-Rafael, 718 F. Supp. 2d at 32.

Mindful that it lacks the authority "to raise the FSIA terrorism exception's statute of limitations on behalf of an entirely absent defendant," Maalouf v. Islamic Republic of Iran, 923 F.3d 1095, 1112 (D.C. Cir. 2019), the Court sees no other jurisdictional hurdles and proceeds onward to the merits.

B.  Liability

The Court is satisfied that both Defendants are liable to Plaintiffs for providing material support for the attempted extrajudicial killings that caused their injuries.  Its analysis begins with a discussion of the attack itself, then considers Defendants' provision of support that led to the incident, and concludes by evaluating Plaintiffs' theories of recovery.

1.  *The Attack*

There is little controversy over whether the PIJ is responsible for the November 4, 2001, attack.  The evidence is straightforward, and the Court will thus spill little ink here.  Dr. Chorev, an expert in Palestinian terror networks, offered extensive evidence on the PIJ's role.  Specifically, he highlighted credible claims of responsibility from PIJ's official website and in its official weekly newspapers.  See Chorev Decl., ¶¶ 26–29; id., Exhs. 3, 5.  He also discussed the Israeli government's official attribution of the attack to the PIJ as further evidence of its culpability.  See Chorev Decl., ¶¶ 30–34; id., Exh. 8 at 2.  Chorev thus "conclude[d] with a high degree of confidence that PIJ is responsible for the Attack."  Chorev Decl., ¶ 38.  The Court finds the evidence he presented to be persuasive and concludes that Plaintiffs have proven that the PIJ was behind the November 4 attack "by evidence satisfactory to the court."  28 U.S.C. § 1608(e).

### 2. *Defendants' Material Support*

The Court similarly agrees that Iran and the IRGC provided material support to the PIJ in the period leading up to the incident. Courts in this district have time and again noted Iran's support for the PIJ during this timeframe. See, e.g., Wultz, 864 F. Supp. 2d at 30; Belkin, 667 F. Supp. 2d at 16–17. Judges have also recognized that Iran's support for terrorism is conducted in part through the IRGC. See, e.g., Belkin, 667 F. Supp. at 18 (describing IRGC as a "means by which Iranian support for terrorism is carried out"). Testimony from Dr. Clawson, a leading expert on Iran and Director of Research at the Washington Institute for Near East Policy, confirms those findings. He walked the Court in detail through the relationship among Iran, the IRGC, and the PIJ, concluding that "there is ample evidence that Iran and the IRGC have supplied substantial material support to PIJ during the relevant period." Clawson Decl., ¶ 58. The Court finds such evidence, and the reasoning of this district's prior decisions, to be persuasive. It thus concludes that Plaintiffs have sufficiently proven that Iran and the IRGC provided relevant material support to the PIJ.

### 3. *Plaintiffs' Theories of Liability*

Although § 1605A provides a private right of action, it requires plaintiffs "to prove a theory of liability." Valore, 700 F. Supp. 2d at 73; see also Rimkus v. Islamic Republic of Iran, 750 F. Supp. 2d 163, 175–76 (D.D.C. 2010) ("[P]laintiffs in § 1605A actions . . . must articulate the justification for such recovery, generally through the lens of civil tort liability."). Consistent with guidance from the D.C. Circuit, district courts "rely on well-established principles of law, such as those found in Restatement (Second) of Torts," to determine liability under the FSIA. See In re Islamic Republic of Iran Terrorism Litig., 659 F. Supp. 2d 31, 61 (D.D.C. 2009); see also Bettis v. Islamic Republic of Iran, 315 F.3d 325, 333 (D.C. Cir. 2003) (using Restatement

"as a proxy for state common law" in determining FSIA liability).  Here, Plaintiffs assert three

such theories: assault, battery, and intentional infliction of emotional distress.  All three clear the

bar.

First, assault liability for attempted extrajudicial killing under the FSIA requires two

conditions: "(1) [defendants] acted intending to cause a harmful contact with, or an imminent

apprehension of such a contact by, those attacked[,] and (2) those attacked were thereby put in

such imminent apprehension."  <u>Wultz</u>, 864 F. Supp. 2d at 35 (internal punctuation omitted)

(quoting Restatement (Second) of Torts § 21(1)).  Defendants acted with manifest intent to cause

harmful contact and did put at least Ilana and Myriam in imminent apprehension — indeed, such

is the entire purpose of terrorism.  <u>See</u> ECF No. 39 (Supplemental Memorandum), Attach. 1

(Hearing Transcript) at 9:24–11:6; <u>Valore</u>, 700 F. Supp. 2d at 76.  They are thus liable for assault.

Next, battery liability arises when defendants acted "[(1)] intending to cause a harmful or

offensive contact with, or an imminent apprehension of such a contact by, those attacked and (2)

a harmful contact with those attacked directly or indirectly resulted."  <u>Wultz</u>, 864 F. Supp. 2d at

36 (internal punctuation alterations omitted) (quoting Restatement (Second) of Torts § 13).

Without question, the relevant act of terrorism both intended to cause and did result in harmful

contact with Ilana, Miryam, Chana Aidel, and Tova; the Court thus finds Defendants liable for

battery.

Finally, all Plaintiffs claim intentional infliction of emotional distress.  Under general

principles of tort law, "[o]ne who by extreme and outrageous conduct intentionally or recklessly

causes severe emotional distress to another is subject to liability for such emotional distress,"

both to the victim and "to a member of such person's immediate family who is present at the

time."  <u>Estate of Heiser v. Islamic Republic of Iran</u>, 659 F. Supp. 2d 20, 26 (D.D.C. 2009)

(quoting Restatement (Second) of Torts § 46). As the Heiser court explained, terrorism is "unique among the types of tortious activities in both its extreme methods and aims," in that it is "intended to cause the highest degree of emotional distress, literally, terror." Id. at 27 (internal quotation marks and citation omitted). For that reason, immediate family members of terrorism victims may state a claim for IIED even if they were not present at the site of the attack. See Republic of Sudan v. Owens, 194 A.3d 38, 42 (D.C. 2018).

The Court easily concludes that the attack in question was designed to create severe emotional distress and did cause such distress to all ten Plaintiffs. The four Plaintiffs who were on the bus experienced intense emotional distress as a result of the attack, and Defendants are consequently liable to them for direct-injury damages. See Valore, 700 F. Supp. 2d at 60 (noting survivors' IIED claims as part of direct-injury damages calculation). The six Plaintiffs who were not present are all immediate family members of present victims and also experienced emotional distress from the attack. Defendants are thus liable to them as well, here for solatium damages. Id. at 78 (noting that solatium damages are "the sort of damages sought for IIED" for family members of victims).

C. Damages

While establishing liability here is relatively straightforward, that is not the case with the amount of damages to award. The valuation of serious psychological injuries among different family members is an inherently delicate task, not susceptible to rote calculations. Indeed, "assessing damages for pain and suffering is an imperfect science, as no amount of money can properly compensate a victim for the suffering he or she endures during and after an attack." Goldstein v. Islamic Republic of Iran, 2019 WL 1756024, at *3 (D.D.C. Apr. 19, 2019). The

Court begins with several general observations about damages under the FSIA before considering each Plaintiff's claims in turn.

Plaintiffs seek three types of damages: direct-injury damages, solatium damages, and punitive damages. Their request for punitive damages, see Compl., ¶ 131, must be dismissed given this Circuit's intervening holding in Owens v. Republic of Sudan, 864 F.3d 751, 812 (D.C. Cir. 2017), cert. granted in part sub nom. Opati v. Republic of Sudan, 2019 WL 2649832 (U.S. June 28, 2019). There, that court vacated a punitive-damages award against Sudan, holding that "the FSIA terrorism exception does not retroactively authorize the imposition of punitive damages against a sovereign for conduct occurring before the passage of § 1605A" in January 2008. Id.; see also Akins v. Islamic Republic of Iran, 332 F. Supp. 3d 1, 45 (D.D.C. 2018) (applying Owens to bar punitive damages where attack preceded § 1605A). As the incident here occurred in 2001, Plaintiffs may not recover punitive damages. In fact, they have indirectly acknowledged as much in recent filings. See ECF No. 30 (Memorandum in Support of Motion for Default Judgment) (failing to reiterate request for punitive damages).

That leaves direct-injury and solatium damages. The former are intended to compensate attack survivors based on factors including "the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life." O'Brien v. Islamic Republic of Iran, 853 F. Supp. 2d 44, 46 (D.D.C. 2012) (citation omitted); accord Wultz, 864 F. Supp. 2d at 37. Over the years, courts have developed a general framework for awarding direct-injury damages. They begin "with the baseline assumption that persons suffering substantial injuries in terrorist attacks are entitled to $5 million in compensatory damages." Wultz, 864 F. Supp. 2d at 37–38 (emphasis added). Such substantial injuries include "compound fractures" and "severe flesh wounds." Valore, 700 F.

Supp. 2d at 84; see also Peterson v. Islamic Republic of Iran, 515 F. Supp. 2d 25, 54 (D.D.C. 2007). Courts deviate downwards and award damages between $2 and $3 million for less severe physical injuries, such as "where victims suffered only minor shrapnel injuries or minor injury from small-arms fire" in addition to psychological trauma. See Valore, 700 F. Supp. 2d at 84; Peterson, 515 F. Supp. 2d at 54–55.

Most useful here is the framework for smaller-scale, direct physical injuries that our district articulated in Wamai v. Republic of Sudan, 60 F. Supp. 3d 84 (D.D.C. 2014), aff'd in part, vacated in part on other grounds *sub nom.* Owens, 864 F.3d at 825. In Wamai, the court awarded damages to victims of the 1998 bombings of the U.S. Embassies in Kenya and Tanzania. Recognizing that "[a] great number of plaintiffs were injured in the bombings" and that plaintiffs' injuries "span[ned] a broad range," the court identified six general categories of plaintiffs. Id. at 92. For those who suffered little to no physical injury, the court awarded $1.5 million. Id. The court increased that award to $2 million for plaintiffs who suffered injuries "such as lacerations and contusions caused by shrapnel, accompanied by severe emotional damages," id. (internal punctuation omitted), and to $2.5 million for people "who suffered more serious physical injuries, such as broken bones, head trauma, some hearing or vision impairment, or impotence." Id. Moving upward, those "with even more serious injuries," such as "spinal injuries not resulting in paralysis, more serious shrapnel injuries, head trauma, or serious hearing impairment," received $3 million. Id. Victims who suffered injuries similar to those for which other courts had awarded the "baseline" of $5 million — including "vision impairment, many broken bones, severe shrapnel wounds or burns, lengthy hospital stays . . . and permanent injuries" — received that baseline amount. Id. at 92–93. Finally, people with "even more grievous wounds such as lost eyes, extreme burns . . . or [who] endured months of recovery in

hospitals" received awards of $7.5 million.  Id. at 93.  These categories all assume severe

psychological injuries.  Id. at 92–93.  That framework aids this Court in its determinations of

direct damages.

Solatium damages, by contrast, serve a different purpose.  As defined by the D.C. Circuit

last year in Fraenkel v. Islamic Republic of Iran, 892 F.3d 348 (D.C. Cir. 2018), these damages

seek to compensate victims for the "[m]ental anguish, bereavement and grief" resulting from a

loved one's death or injury.  Id. at 356–57; see also Valore, 700 F. Supp. 2d at 85.  To determine

proper solatium awards, the Fraenkel panel recognized that "District Court judges invariably

must exercise discretion in determining damages awards under the FSIA."  Fraenkel, 892 F.3d at

361.  Appellants there had argued that the district court "broke from precedent" by awarding

solatium damages "dramatically lower" than those received by similarly situated plaintiffs.  Id.

The D.C. Circuit rejected their claim.  It noted that "many FSIA decisions" followed the

solatium-damage ranges summarized in Estate of Heiser v. Islamic Republic of Iran, 466 F.

Supp. 2d 229 (D.D.C. 2006), which recommended awarding around $2.5 million for siblings of

deceased victims, $5 million for parents, and $8 to $12 million for spouses.  See Fraenkel, 892

F.3d at 361.  But the Circuit "decline[d] to impose Heiser's framework as a mandatory scheme,"

id., holding that "[t]he decision in Heiser . . . is not binding precedent" and that, subject to abuse-

of-discretion review, district courts have wide latitude to craft damage awards "based on the

particular facts of each case."  Id. at 351.

As instructed, this Court will exercise its discretion in fashioning equitable solatium

awards.  It will do so based on the factors our Circuit instructed courts to consider in Fraenkel.

See 892 F.3d at 359 ("On remand, the District Court should apply the considerations outlined in

[Flatow v. Islamic Republic of Iran, 999 F. Supp. 1, 30–32 (D.D.C. 1998),] . . . to determine the

appropriate amounts of solatium damages.").  Among those factors, the Court of Appeals highlighted two: "[h]ow the claimant learned of" the directly injured plaintiff's injuries and the "nature of the relationship" between the claimant and the directly injured plaintiff.  Id. at 357 (quoting Flatow, 999 F. Supp. at 30–31).  The Court will first consider the seven Schertzman Plaintiffs and then separately assess the three Miller Plaintiffs.

1. *Schertzman Plaintiffs*

Ilana Schertzman Cohen suffered direct injuries in the attack.  By way of physical injury, she sustained a shrapnel wound for which she received medical care, and she testified that the attack left her with some continuing neck pain.  See Tr. at 15:8–16; id. at 18:9–11.  She also experienced significant psychological trauma, including watching her close friend Shoshana Ben-Yishai, who was sitting right next to her on the bus, suffer a fatal gunshot wound.  Id. at 9:5–13:16.  After a brief hospital visit, Ilana attended Shoshana's funeral and then returned home, where she continued to experience significant trauma as a result of the attack.  Id. at 17:8–23; id. at 18:2–20:22.

These physical injuries place her towards the lower end of the Wamai framework.  Her wounds are more similar to the "lacerations and contusions caused by shrapnel" that merit an award of $2 million than they are to more severe physical injuries such as "broken bones, head trauma, [or] some hearing or vision impairment" that merit $2.5 million.  See 60 F. Supp. 3d at 92; see also Goldstein, 2019 WL 1756024, at *2–3 (awarding $2.5 million to bus-attack terror victim whose injuries required "multiple visits to doctors and hospitals" and continue to present).  The Court recognizes, however, the heightened emotional trauma of watching her best friend shot before her eyes.  While courts do not typically award damages for the death of close friends, cf. Supplemental Memorandum at 4–5 (showing courts' consideration of injury and death of non-

immediate family members), the Court will nonetheless recognize the emotional trauma of Shoshana's death as one factor in its holistic analysis for Ilana. All told, it will deviate upward and award her $2.5 million in direct-injury damages.

The remaining Schertzman Plaintiffs were not present for the attack, but claim solatium damages based on the mental anguish it caused them in relation to Ilana. The Court begins with her parents, Leslie and Donald Schertzman. Although both quickly learned that Ilana was injured but safe, see Tr. at 25:7–10 (Leslie); id. at 36:6–37:4 (Donald, noting initial confusion but soon hearing Ilana was safe), the Court understands that they suffered as a result of the attack. Their testimony and written declarations make plain that they are loving parents and were deeply shaken by the incident itself and the toll it took on their daughter.

In determining a proper solatium award, the Court is mindful that prior courts have awarded around $2.5 million each to parents of plaintiffs who suffered direct injuries that merited $5 million in damages. See, e.g., Valore, 700 F. Supp. 2d at 85; Peterson, 515 F. Supp. 2d at 52. The Court follows other district courts' prudent approach of scaling solatium awards in proportion to direct-injury awards and, because it awards Ilana 50% of the $5 million baseline, thus begins its analysis around the range of $1.25 million — i.e., 50% of $2.5 million. See Goldstein, 2019 WL 1756024, at *4 ("[S]olatium awards for relatives of victims should be proportionate to the pain-and-suffering awards to the victims themselves."); Spencer v. Islamic Republic of Iran, 71 F. Supp. 3d 23, 28 (D.D.C. 2014) (observing the "general approach of reducing the solatium awards of family members in rough proportion" to the victim's direct-injury award). Starting with that range, the Court must next exercise its "discretion in determining solatium damages." Fraenkel, 892 F.3d at 361. It must independently analyze what

award would most fairly compensate Leslie and Donald for their "[m]ental anguish, bereavement, and grief." Flatow, 999 F. Supp. at 30; see also Fraenkel, 892 F.3d at 359.

Here, the Court believes awards of $800,000 to each parent — $1.6 million in total — is just compensation. That award is less than some past awards to parents of terrorism survivors. See, e.g., Akins, 332 F. Supp. 3d at 44 (awarding parents of bombing victims half their childrens' awards); Wamai, 60 F. Supp. 3d at 94–96 (awarding parents damages of $2.5 million, except where those awards exceeded victims' direct-injury damages). But it is greater than others recently given to parents whose suffering may well have been greater than that of the Schertzman parents. As an example, in Allan v. Islamic Republic of Iran, 2019 WL 2185037 (D.D.C. May 21, 2019), plaintiffs were survivors (and their families) of the "dramatic and terrifying" terrorist hijacking of TWA Flight 847. Id. at *1. The Allan court gave the lowest damage awards to what it deemed the "Group I" plaintiffs. Those were survivors who were released on the first day of the hostage crisis, but during that day were denied food and water, forced into painful positions for extended periods, and "subject[ed] to or forced to watch mock executions." Id. at *7. Parents of Group I survivors received solatium damages of $560,000 each. Id.

The Court believes it inappropriate to award the Schertzman parents much more than this district awarded those parents. Those parents were stuck with no information about their children for a full day, while the Schertzmans quickly learned that Ilana had survived the attack. See Tr. at 25:7–10; id. at 36:6–37:4; see also Fraenkel, 892 F.3d at 357 (noting importance of how claimant learns of attack). Though it is treacherous to try to compare personal suffering, the uncertainty in a protracted hostage standoff seems at least comparable to the ordeal the Schertzman parents endured, with comparable long-term trauma for the family unit. And the Schertzman parents' suffering, moreover, may not be quite as harrowing as that of the parents

whose children were "subjected to 35 additional hours of the same abuse," Allan, 2019 WL 2185037, at *7, who received just over a million dollars each. Id. This Court thus finds that the circumstances of this case and recent rulings in this district warrant solatium damages of $800,000 each for Leslie and Donald Schertzman.

The remaining four Schertzman Plaintiffs are Ilana's four siblings: Daniel, Abraham, and Yehuda Schertzman, and Arielle Schertzman Fisher. The Court is persuaded by their testimony and by Dr. Strous's sealed declaration that all four suffered significant emotional trauma as a result of their sister's involvement in the attack. See Tr. at 45:10–49:10 (Daniel); id. at 60:25–67:6 (Abraham); id. at 70:13–74:23 (Yehuda); id. at 52:21–57:5 (Ariella). Courts in this district have long awarded siblings of terrorism victims half the solatium damages awarded to their parents, and this Court sees no reason for deviating upward for any of the four siblings. See, e.g., Valore, 700 F. Supp. 2d at 85; Peterson, 515 F. Supp. 2d at 51. Based on the analysis for Leslie and Donald Schertzman, accordingly, the Court will award Daniel, Abraham, and Yehuda Schertzman, and Ariella Schertzman Fisher $400,000 each in solatium damages.

### 2. *Miller Plaintiffs*

Myriam Miller was on the bus at the time of the attack with her two children, Chana Aidel Schertzman Miller (then five) and Tova Miller (then two). All three seek direct-injury and solatium damages based on each other's presence on the bus.

The Court elects to craft one award for each Plaintiff that encompasses the mental anguish each suffered for her own and her family members' injuries — in other words, it declines to disaggregate its direct-injury and solatium awards. Where multiple family members are all injured in the same attack, the Court finds it more prudent to calculate one global award for each Plaintiff, rather than to distinguish emotional suffering caused to an individual by the attack from

emotional suffering caused by having family present in the same attack.  The Court sees nothing in § 1605A or in this Circuit's precedent that requires it to separate the direct-injury and solatium damages.  The statute specifies that "damages <u>may</u> include economic damages, solatium, pain and suffering, and punitive damages," but does not require separate calculations for each category.  <u>See</u> 28 U.S.C. § 1605A(c)(4) (emphasis added).  In calculating these separately, past courts have arrived at total resulting compensation that seems rather inflated, perhaps as a result of double-counting.  <u>See, e.g.</u>, <u>Cohen v. Islamic Republic of Iran</u>, 268 F. Supp. 3d 19, 29 (D.D.C. 2017) (awarding heightened $5 million direct damages to mother who suffered minor physical injuries but mental anguish at her children's injuries, before also awarding solatium damages for that same mental anguish, leading to almost $13 million compensatory award).  Exercising its equitable discretion under <u>Fraenkel</u>, the Court declines to perform its calculus in that way and crafts its awards as total compensation for Plaintiffs' losses.

Starting with the mother, Myriam Miller offered powerful testimony about the harm the attack has caused her.  <u>See</u> Tr. at 84:3–88:21.  Although she suffered little by way of physical injury, her emotional trauma was significant and lasting.  Exacerbated significantly by the presence of her two daughters on the bus, whom she believes she did not adequately protect, the attack destabilized Myriam's life.  Once a confident professional, the attack left her with intense, long-term psychological harm.  <u>See</u> Tr. at 78:1–6; <u>id.</u> at 84:3–88:21.

In line with our district's precedent for determining direct-injury and solatium damages, this Court will award Myriam $2.5 million.  That award is designed to compensate her for the mental anguish she suffered in the attack in regard to her own safety and that of her daughters.  Myriam suffered no notable physical injuries in the attack; as a default, she would be entitled to direct-injury damages of around $1.5 million.  <u>See</u> <u>Wamai</u>, 60 F. Supp. 3d at 92; <u>Valore</u>, 700 F.

Supp. 2d at 84–85.  In recognition of the intense emotional trauma she has experienced from her children's presence on the bus with her, and the seriously deleterious effects the attack has had on her career, the Court finds an upward departure to $2.5 million appropriate in total for both direct-injury and solatium damages.

Chana Aidel was five years old at the time of the attack and remembers most of the events of that day.  See Tr. at 93:25–94:3.  Aside from minor knee pain, she suffered no physical injuries.  She also testified that, at her age, she did not understand the events and thus did not feel fear.  See Tr. at 95:11; id. at 14–15.  Yet the attack was a formative moment in her childhood and left her with lasting psychological trauma.  See Tr. at 96:9–100:23.  Balancing Chana Aidel's lack of immediate physical injuries or emotional trauma with the longer-term impacts the attack has had on her family life, the Court finds a $1 million damage award appropriate in total for both direct-injury and solatium damages.

Tova was two years old at the time of the attack and, not surprisingly, has no independent recollection of what happened.  See Tr. at 102:1–5.  As a consequence, her damages should fall somewhat below those awarded to Chana Aidel, and this Court believes $850,000 a fitting sum.  That award is slightly greater than the direct damages awarded to Elchanan Cohen in a prior case in this district, who was "a few months old at the time of the attack" but suffered a broken hip and "spent hours buried under bodies waiting to be rescued."  Cohen, 268 F. Supp. 3d at 25.  While Tova suffered no such ordeal, the attack did take a lasting toll on her family.  See Tr. at 102:9–105:17.  Rather than recognize that toll with a separate award (as the Cohen court did), this Court believes the proper approach is to award Tova $850,000 in total for direct-injury and solatium damages.

3.  *Interest*

One final bit of housekeeping is in order.  Plaintiffs request prejudgment interest on top of their solatium and damage awards.  The decision to award such interest "is subject to the discretion of the court and equitable considerations."  Oldham v. Korean Air Lines Co., 127 F.3d 43, 54 (D.C. Cir. 1997) (citation omitted); see also Forman v. Korean Air Lines, Co., 84 F.3d 446, 450 (D.C. Cir. 1996).  "When an award without prejudgment interest fully compensates a plaintiff, an award of prejudgment interest no longer has the intended compensatory purpose and should be denied."  Wyatt v. Syrian Arab Republic, 908 F. Supp. 2d 216, 232 (D.D.C. 2012) (quoting Price v. Socialist People's Libyan Arab Jamahiriya, 384 F. Supp. 2d 120, 135 (D.D.C. 2005)).  As have many courts before it, this Court calculates its direct-injury and solatium awards to be fully compensatory.  See Wultz, 864 F. Supp. 2d at 43 (finding direct-injury damages fully compensatory and declining to award prejudgment interest); Thuneibat v. Syrian Arab Republic, 167 F. Supp. 3d 22, 54 (D.D.C. 2016) (noting solatium damages "do not typically require prejudgment interest because they are 'designed to be fully compensatory'") (quoting Wyatt, 908 F. Supp. 2d at 232); see also Akins, 332 F. Supp. 3d at 45–46 (denying prejudgment interest in FSIA terrorism case on same reasoning).  This makes particular sense where the injuries are psychological and thus ongoing, and the compensation assumes suffering beyond the timeframe of the incident itself.  See Oveissi, 768 F. Supp. 2d at 30 n.12 (noting solatium damages are awarded regardless of when attack occurred).  Prejudgment interest, consequently, is not appropriate and will be denied.

In total, the Court will award $10,050,000 in damages to Plaintiffs, distributed as follows:

| Plaintiff | Direct Injuries | Solatium | Total |
|---|---|---|---|
| Ilana Schertzman Cohen | $2,500,000 | | $2,500,000 |
| Leslie Schertzman | | $800,000 | $800,000 |
| Donald Schertzman | | $800,000 | $800,000 |
| Daniel Schertzman | | $400,000 | $400,000 |
| Abraham Schertzman | | $400,000 | $400,000 |
| Yehuda Schertzman | | $400,000 | $400,000 |
| Ariella Schertzman Fisher | | $400,000 | $400,000 |
| Myriam Miller | $2,500,000 | | $2,500,000 |
| Chana Aidel Schertzman Miller | $1,000,000 | | $1,000,000 |
| Tova Miller | $850,000 | | $850,000 |
| Totals | $6,850,000 (including Miller awards) | $3,200,000 | $10,050,000 |

The Court recognizes, as have others before it, that "no amount of money can alleviate the emotional impact of" the attack.  See Fraenkel, 892 F.3d at 357 (quoting Flatow, 999 F. Supp. at 32).   But it sincerely hopes that the compensatory damages it awards today will in some small part help Plaintiffs heal from this heartbreaking chapter in their lives.

## IV. Conclusion

For these reasons, the Court will enter default judgment for Plaintiffs in the amounts listed above. A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date: July 11, 2019